IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ROSEMARI BLAKE-TERRELL, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL NO. H-05-0153 |
| | § | |
| JO ANNE BARNHART, COMMISSIONER | § | |
| OF THE SOCIAL SECURITY | § | |
| ADMINISTRATION, | § | |
| | § | |
| Defendant. | § | |

**<u>MEMORANDUM OPINION</u>**

Pending before the court[1] are Plaintiff's Motion for Summary Judgment (Docket Entry No. 14) and Defendant's Motion for Summary Judgment (Docket Entry No. 16).  The court has considered the motions, all relevant filings, and the applicable law.  For the reasons set forth below, the court **DENIES** Plaintiff's motion and **GRANTS** Defendant's motion.

## I.  Case Background

Plaintiff filed this action pursuant to 42 U.S.C. § 405(g) for judicial review of an unfavorable decision by the Commissioner of the Social Security Administration ("Commissioner") regarding Plaintiff's claim for disability insurance benefits under Title II of the Social Security Act ("the Act").

### A.  Procedural History

Plaintiff protectively filed for disability benefits on March

---

[1]    The parties consented to proceed before the undersigned magistrate judge for all proceedings, including trial and final judgment, pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73.  Docket Entry No. 12.

1, 2001.[2]  In her initial disability report, Plaintiff claimed an inability to work since April 1999 due to depression, degenerative osteoarthritis with spinal stenosis, peripheral neuropathy, hypoglycemia, and high blood pressure.[3]  After Plaintiff's application was denied at the initial[4] and reconsideration levels,[5] she requested a hearing before an Administrative Law Judge of the Social Security Administration ("ALJ").[6]  The ALJ granted Plaintiff's request and conducted a hearing in Bellaire, Texas, on November 1, 2002.[7]  The ALJ issued an unfavorable decision on November 19, 2002.[8]

Plaintiff appealed the ALJ's decision to the Appeals Council,[9] and the Appeals Council sent her case back to the ALJ for resolution of several issues.[10]  A second ALJ addressed the issues at a hearing held on February 17, 2004.[11]  After listening to testimony presented by Plaintiff, two medical experts, and a vocational expert, the ALJ

---

[2]    Transcript of the Administrative Proceedings ("Tr.") 375.

[3]    Tr. 43.

[4]    Tr. 28, 335-39.

[5]    Tr. 340-44.

[6]    Tr. 345.

[7]    See Tr. 446-95.

[8]    See Tr. 324-31.

[9]    Tr. 346.

[10]    See Tr. 347-50.

[11]    See Tr. 496-571.

issued an unfavorable decision on June 18, 2004.[12]  The ALJ found that Plaintiff was not disabled at any time during the period covered by her application because she could perform a significant range of light, unskilled jobs that existed in significant numbers in the national economy.[13]  On October 14, 2004, the Appeals Council denied Plaintiff's request for review of the second decision, thereby making the ALJ's decision the final decision of the Commissioner.[14]

Having exhausted all administrative remedies,[15] Plaintiff brought this civil action for review of the Commissioner's decision.[16]

## B.  Factual History

Plaintiff was born on September 26, 1952, and was fifty-one years old on the date of the second hearing.[17]  Plaintiff received a high school diploma.[18]  Prior to the alleged onset of her disability, Plaintiff was employed as a psychiatric technician, a correctional officer, a security guard, and a delivery truck

---

[12]    Tr. 14-26.

[13]    Tr. 26.

[14]    Tr. 7-9.

[15]    See Harper v. Bowen, 813 F.2d 737, 739 (5th Cir. 1987), for a summary of the administrative steps a disability claimant must take in order to exhaust his administrative remedies.

[16]    Plaintiff's Original Complaint, Docket Entry No. 1.

[17]    Tr. 376, 506.

[18]    Tr. 49, 506.

driver.[19]

### 1.  Medical Record--Back Pain

The medical record indicates that Plaintiff began experiencing left-side back and leg pain in 1999 with no known precipitating injury.[20]   In September 1999, Plaintiff underwent a lumbar laminectomy, which provided only marginal relief.[21]  Post surgery, the pain shifted from the left side of her body to the right side.[22]

Notes from Plaintiff's doctor visits from late 1999 to mid 2001 reveal repeated subjective complaints of back pain.[23]   Two weeks after the surgery, Plaintiff was treated at an after-hours clinic for severe back pain.[24]  Examination revealed, among other findings, restricted straight leg raising with severe spasms in the back, diminished light touch and pinprick on the left side of her back.[25]  At an appointment about a month after her surgery, Plaintiff intimated that she felt she would be unable to return to work, but her treating physician, Hatem Megahed, M.D., ("Dr. Megahed"), indicated to her that he did not believe the medical

---

[19]     Tr. 62, 506, 510, 511, 565.

[20]     See Tr. 160, 184, 512.

[21]     See Tr. 512-13, 160-66.

[22]     See Tr. 160, 513.

[23]     See Tr. 81-262.

[24]     Tr. 165.

[25]     Id.

findings would warrant a determination of disability.[26]   He noted overall improvement, despite her complaints.[27]   A month later, he noted gradual improvement, prescribed a back exercise program, and cleared her to look for a new job.[28]

In December 1999, Amitabh Shukla, M.D., ("Dr. Shukla"), a neurologist, examined Plaintiff and found increased, but restricted, ability to perform straight leg raising, diminished light touch and pinprick on her back, and marked lumbosacral paraspinal muscular spasm bilaterally.[29]   At a follow-up neurology appointment in February 2000, Plaintiff reported that she continued to experience lower back pain with radicular symptoms.[30] Her straight leg raising ability remained static.[31]   Although Plaintiff had returned to her former position as a psychiatric technician, she indicated that the work aggravated her back pain.[32] Dr. Shukla explained the relative benefits and drawbacks of various pain and spasm medications, and Plaintiff opted for nortriptyline, a medication she had tried previously.[33]   The doctor also instructed Plaintiff to bring him a

---

[26]   Tr. 164.

[27]   Id.

[28]   Tr. 163.

[29]   Tr. 161–62.

[30]   Tr. 156.

[31]   Tr. 157.

[32]   Tr. 156.

[33]   Tr. 157.

job description or questions from her supervisor so that he could identify appropriate work restrictions.[34]

Cornelius Chinn, M.D., ("Dr. Chinn") examined Plaintiff in March 2000, following the administration of a glucose tolerance test that indicated Plaintiff had hypoglycemia.[35]  He gave Plaintiff a referral for a transcutaneous electric nerve stimulation (TENS) unit to treat her chronic back pain.[36]

Plaintiff returned to the after-hours clinic in April 2000, complaining of marriage discord and neck pain, and in June 2000, complaining of recurrent back pain.[37]  Other than slight tenderness in the lumbosacral area, Plaintiff's back examination at the June 2000 appointment produced normal results.[38]  When Plaintiff returned to Dr. Shukla for a follow up in July 2000, she reported that she continued to experience occasional lower back pain with no other neurological symptoms.[39]  Plaintiff again sought treatment at the after-hours clinic on September 4, 2000, for treatment of right-side lower back pain that radiated down her right leg.[40]   Upon examination, the doctor found tenderness to palpation of the lower

---

[34]   Tr. 158.

[35]   Tr. 149, 152-53.

[36]   Tr. 149.

[37]   Tr. 143-44, 145-46.

[38]   Tr. 143.

[39]   Tr. 141.

[40]   Tr. 136.

paraspinal muscles and right-side pain upon straight leg raising.[41]
The doctor ordered an injection of an anti-inflammatory medication
to reduce pain and swelling and instructed Plaintiff to apply warm
compresses to the painful area.[42]  On the following day, she
returned to see Dr. Chinn, who prescribed pain medication and
referred her to neurology for evaluation of her chronic back pain.[43]
He noted that "[s]traight leg test [was] equivocal."[44]

Suprabha Bhat, M.D., ("Dr. Bhat"), a neurologist, examined
Plaintiff in September 2000 and documented:  "She ambulates
independently, but her gait appears cautious and she tends to limp
with her right leg."[45]  Dr. Bhat referred her to a pain management
specialist.[46]  At another visit to the after-hours clinic less than
two weeks after seeing Dr. Bhat, Plaintiff complained of severe pain
shooting down her back.[47]  The examining physician noted mild
tenderness and palpable muscle tightness in her back.[48]  He gave
Plaintiff an injection to combat inflammation.[49]  She reported to

---

[41]     Id.

[42]     Id.

[43]     Tr. 135.

[44]     Id.

[45]     Tr. 133, 134.

[46]     Tr. 133-34.

[47]     Tr. 131.

[48]     Id.

[49]     Id.

Dr. Chinn, a few days later, that the injection effectively reduced her pain, although it did not totally relieve it.[50]   Then, in October 2000, she visited Dr. Chinn again for low back pain.[51]   He documented the following musculoskeletal findings:

> She has good mobility of the cervical spine.  Range of motion of the lumbar spine is markedly restricted especially on flexion.  There is tenderness and spasm of the lumbar paraspinous muscles.  Straight leg raising is positive on the right at 45 degrees and positive on the left at 60 degrees.  Motor strength is 5/5 at the upper extremities.  At the lower extremities, motor strength is 5/5 throughout.  There is no evidence of muscular atrophy.  She has a mildly antalgic gait and is unable to walk on her heels or toes because of her pain.[52]

Dr. Chinn ordered caudal epidural steroid injections.[53]   Plaintiff received the three injections in November 2000, December 2000, and January 2001.[54]   Plaintiff reported significant, but temporary, relief from the injections.[55]

Jovan Popovich, M.D., ("Dr. Popovich"), a rheumatologist, examined Plaintiff in December 2000.[56]   Dr. Popovich recorded a negative straight leg raising test, equal and symmetric deep tendon reflexes at the knees, no reflex reaction at the ankles, minimal

---

[50]   Tr. 129.

[51]   See Tr. 103-04.

[52]   Tr. 104.

[53]   Id.

[54]   Tr. 79-97, 100-102.

[55]   Tr. 100-102.

[56]   Tr. 120-23.

difficulties walking on the heels and toes, and decreased range of back.[57]   A total body scan in January 2001 revealed degenerative changes in her spine, shoulder, right elbow, hips, knees, and right foot.[58]

In March 2001, Dr. Chinn treated Plaintiff again for back and leg pain after falling the previous night.[59]   At that time, the straight leg raising test was positive.[60]  Dr. Chinn discontinued a medication prescribed for muscle spasms because he suspected it contributed to Plaintiff's fall and scheduled an magnetic resonance imaging scan ("MRI") to rule out additional back injury.[61]  The next month, Mike Yuan, M.D., ("Dr. Yuan"), a neurologist, examined Plaintiff on referral from Dr. Chinn.[62]  Reporting pain in the range of seven out of ten, Plaintiff told the physician that walking and standing for long periods aggravated her pain symptoms.[63]   Dr. Yuan's examination revealed:  "Sensory exam is intact to pinprick, temperature, light touch; vibration joint position is intact.  Gait is steady, narrow base. . . . Finger-to-nose, heel-to-shin are normal.  Patient had positive straight leg raising sign, both sides;

---

[57]    Tr. 122.

[58]    Tr. 124.

[59]    Tr. 112.

[60]    Id.

[61]    Id.

[62]    See Tr. 110-111.

[63]    Tr. 110.

paraspinal muscle spasm on lumbar region."[64]

An MRI report dated April 18, 2001, indicated postsurgical changes, multiple levels of facet joint hypertrophy, moderate bilateral forminal stenosis, and a bulging disc with central/right paracentral disc protrusion with compressed nerve root.[65]   Dr. Yuan's May 2, 2001, report states that Plaintiff's strength was 5/5 throughout, the sensory exam was intact, her gait was steady, and her coordination was normal.[66]   He observed paraspinal muscle spasm and positive straight leg sign bilaterally.[67]   Dr. Yuan scheduled Plaintiff for epidural steroid injections.[68]

A consultative examination conducted on July 30, 2001, revealed that lumbar spine was restricted on flexion and straight leg raising was positive at fifty degrees on right and sixty degrees on left.[69]   Plaintiff walked with a slight limp on the right, but showed no localized sensory loss, muscle weakness, or atrophy.[70]   In his assessment, the physician stated that assistive devices were not required for general ambulation and that Plaintiff may be a

---

[64]     Tr. 110-111.

[65]     Tr. 109; see also Tr. 106.

[66]     Tr. 106.

[67]     Id.

[68]     Id.

[69]     Tr. 255.

[70]     Id.

candidate for chronic pain therapy or epidural steroid injections.[71]

Ricardo Pocurull, M.D., ("Dr. Pocurull") of the Rheumatic Disease Clinic of Houston ("Rheumatic Clinic") diagnosed Plaintiff with fibromyalgia in August 2001.[72]  At the appointment, Plaintiff experienced no tenderness along her spine, but experienced significant paraspinal tenderness and spasm.[73]  The straight leg raising test was positive on the right.[74]  Dr. Pocurull noted that she required the used of a cane.[75]  When Dr. Pocurull saw Plaintiff on October 9, 2001, Plaintiff stated that she was experiencing pain "all over."[76]  He noted no tingling, no numbness, positive straight leg raising, and an atalgic gait.[77]

Dr. Pocurull completed a fibromyalgia residual functioning capacity ("RFC") questionnaire in late October 2001.[78]  As far as physical limitations, Dr. Pocurull opined that Plaintiff could walk less than one block without rest or severe pain, could sit for one to two hours at a time, could stand for ten minutes at a time.[79]  In

---

[71]   Tr. 256.

[72]   Tr. 263.

[73]   Id.

[74]   Id.

[75]   Id.

[76]   Tr. 297.

[77]   Id.

[78]   See Tr. 310-15.

[79]   Tr. 313.

11

an eight-hour work day, he estimated that Plaintiff could stand/walk for less than two hours and could sit for about two hours.[80]  Dr. Pocurull also indicated that Plaintiff required the used of a cane, needed to walk for ten minutes every hour, needed the freedom to shift positions between standing and sitting at will, and needed to take breaks every hour of fifteen to thirty minutes each, during which time she would need to lie down.[81]  In his opinion, Plaintiff was only capable of lifting less than ten pounds occasionally and occasionally could twist, rarely stoop, and never crouch or climb ladders or stairs.[82]

In early November 2001, Plaintiff returned to the Rheumatic Clinic and, again, described her pain as being "all over."[83]  She denied experiencing any tingling or numbness, but had some tenderness.[84]  The doctor observed a normal gait and a negative straight leg raising test.[85]  He also noted that her fibromyalgia had improved.[86]  The next progress note in the medical record that mentions her back pain is dated February 11, 2003.[87]  On that date,

---

[80]     Id.

[81]     Tr. 313-14.

[82]     Tr. 314.

[83]     Tr. 296.

[84]     Id.

[85]     Id.

[86]     Id.

[87]     See Tr. 393.

Plaintiff returned to the Rheumatic Clinic for a fibromyalgia follow-up appointment.[88]   Plaintiff reported continued back pain, but experienced no pain on straight leg raising.[89]

In September 2003, Plaintiff visited the West Houston Medical Center emergency room because of acute lower back pain.[90]   She told the treating physician that the pain had not been "this bad in years."[91]   Straight leg raising caused pain on the right side.[92] After being seen by a physician, she was discharged with prescriptions for pain medications.[93]   Just ten days later, Plaintiff went to the emergency room at Polly Ryon Hospital for treatment of her back pain.[94] She experienced pain on straight leg raising at forty-five degrees bilaterally.[95]   After the administration of medications provided some pain relief, Plaintiff was discharged with prescriptions for pain medication.[96]

The following month, Plaintiff received treatment at Fort Bend Family Health Center, at which time she reported experiencing back

---

[88]   Id.

[89]   Id.

[90]   See Tr. 396-402.

[91]   Tr. 402.

[92]   Tr. 401.

[93]   Tr. 401-02.

[94]   See Tr. 408-16.

[95]   Tr. 413.

[96]   Tr. 411, 415.

13

pain.[97]  She indicated that her pain medications helped relieve the pain.[98]  Plaintiff again sought emergency treatment for her back pain on December 30, 2003, this time at Memorial City Hospital.[99]  The straight leg raising test was negative and the overall examination produced normal results.[100]  The physician advised her to rest her back and to treat it with ice or heat, and he prescribed pain medication.[101]  The final treatment report comes from a February 2004 emergency room visit for chronic back and neck pain.[102]  The treating physician released her with prescriptions for pain medication and instructions to follow up with other physicians.[103]

Throughout the record are references to medications prescribed for the treatment of pain, inflammation, and muscle spasms, including Celestone, Darvocet, Flexeril, Klonopin, Lidoderm, Mobic, Naprosyn, Naproxen, Neurontin, Oxycontin, Pamelor, Relafen, Robaxin, Soma, Toradol, Vicodin, Vioxx, and Zanaflex.[104]

### 2.  Medical Record--Hand Swelling

---

[97]    Tr. 404.

[98]    Id.

[99]    See Tr. 417-25.

[100]    Tr. 421.

[101]    Tr. 419.

[102]    Tr. 426-28.

[103]    Tr. 426.

[104]    See, e.g., Tr. 48, 56, 99, 100, 103, 115, 131, 135, 136, 143, 162, 165, 250, 263, 265, 296, 308, 316, 317, 323, 390, 397, 407, 415, 429.

14

In addition to back pain, Plaintiff experienced intermittent swelling in her extremities.  In June 1999, Plaintiff reported swelling in her hands and feet and tingling and numbness in her hands.[105]  Dr. Chinn changed her medication with apparent success.[106] As reflected in the medical record, it was not until April 2000 that Plaintiff complained again about any problems with her arms or hands.[107]  On that occasion, Plaintiff complained of pain in her right arm lasting for two days.[108]  X-rays revealed nothing more significant than degenerative changes.[109]

In December 2000, Dr. Popovich noted no pain to range of motion in Plaintiff's elbows, hands, and wrists.[110] During a follow-up visit in March 2001, Plaintiff denied experiencing any swelling, warmth, redness, or stiffness in the joints.[111]  However, a few weeks later, Plaintiff reported swelling in her feet and hands since she beginning to take Vioxx.[112]  A physician who saw Plaintiff in July 2001 for a consultative examination found no clubbing, cyanosis,

---

[105]   Tr. 189.

[106]   Id.

[107]   See Tr. 147.

[108]   Id.

[109]   Tr. 147, 148.

[110]   Tr. 122.

[111]   Tr. 113.

[112]   Tr. 99.

15

edema, warmth, effusion, or deformity in her extremities.[113]   Her peripheral pulses were intact, and the joint examination was normal with Plaintiff displaying a full range of motion.[114]   The physician noted that her upper extremity function was normal and that she was able to button clothes and sign her name.[115]

According to Dr. Pocurull, Plaintiff exhibited normal range of motion in her upper extremities in October 2001.[116]   Despite the observation, Dr. Pocurull's fibromyalgia RFC assessment, completed later that month, stated that Plaintiff had significant limitations in doing repetitive reaching, handling, or fingering.[117]   Until October 2002, a year later, nothing in the record refers to swelling in Plaintiff's hands.   A progress note from October 2002 indicates that Plaintiff was experiencing swelling in her hands and feet.[118]   The next progress note that indicates swelling is dated October 21, 2003.[119]   At that time, her distal interphalangeal joints were swollen.[120]   When Plaintiff was seen at Memorial City Hospital emergency room in December 2003, she reported numbness in her hands,

---

[113]   Tr. 255.

[114]   Id.

[115]   Tr. 256.

[116]   Tr. 263.

[117]   Tr. 315.

[118]   Tr. 390.

[119]   Tr. 404.

[120]   Id.

but had no edema.[121]   Plaintiff told the treatment provider that she was unable to take anti-inflammatory medications because they caused her to "swell up."[122]   The medical record contains no other references to swelling in the hands.

### 3.   Plaintiff's Testimony

According to a report completed by Plaintiff in March 2001, she was "unable to sit or stand for any length of time, because of the arthrit[i]s, spinal stenosis and neuropathy [and] because of nerve damage in [her] legs."[123]   In a supplemental questionnaire completed a couple months later, Plaintiff expounded on her limitations, explaining that she was unable to stand for longer than ten minutes or walk more than a few feet.[124]   She also stated that she tired easily due to lack of sleep at night and experienced medium to severe pain in her lower back and legs every day and sometimes in her arms, wrists, hands and neck.[125]

On occasion, the pain interfered with her ability to finish a meal or complete household chores.[126]   Plaintiff indicated that her symptoms diminished her ability to perform the following activities:

---

[121]   Tr. 420-21.

[122]   Tr. 421.

[123]   Tr. 43.

[124]   Tr. 56.

[125]   Id.

[126]   Id.

general cleaning that involves bending, stooping, or kneeling, such as making up the bed and cleaning the bathtub; shampooing her hair; sitting too long; standing; walking too far; lifting/carrying more than five pounds; using hands to write or cook; bending, kneeling, squatting, or climbing; working or reaching overhead; and driving a car.[127]  As stated in Plaintiff's supplemental questionnaire, Plaintiff experienced difficulty remembering things, completing tasks, and making decisions due to the stress, chronic pain, and medications.[128] Despite her limitations, Plaintiff reported that she was able to bathe, to brush her teeth, to fix her hair, to shave, to select appropriate clothing, to cook (a little at a time), to pay bills, to visit, and to shop/make change without the assistance of another person.[129]

In July 2001, Plaintiff reported to the physician during a consultative examination that the pain she experienced daily prevented her from bending or lifting on a consistent basis.[130]  She was able to walk for less than twenty minutes at a time and to sit for twenty minutes.[131]  Plaintiff also stated that she could dress

---

[127]    Tr. 57, 58.

[128]    Tr. 60.

[129]    Tr. 59-60.

[130]    Tr. 253.

[131]    Id.

herself and could perform personal hygiene and light cooking.[132]  At
a psychiatric evaluation in August 2001, Plaintiff told the examiner
that she was able to cook, to perform household chores, to grocery
shop, to read some, and to go to church some, but only rarely was
able to drive, to pay her bills, or to go out to eat.[133]

Plaintiff's first hearing before an ALJ was held in November
2002, at which time she claimed an inability to work due to
depression, spinal disorder with peripheral neuropathy,
fibromyalgia, fluctuating vision, and "possible arthritis."[134]  She
attributed swelling and pain in her wrists, feet, ankles, right
knee, shoulders, neck, and arms to fibromyalgia and described that
pain as a discomfort.[135]  The pain in her back, on the other hand,
was so intense that she could barely stand it, she testified.[136]

As far as physical limitations, Plaintiff indicated that she
could lift no more than a half-gallon of milk, needed to lie down
for four to six hours a day, could stand for ten to fifteen minutes
at a time (on an average day), could walk for five minutes at a

---

[132]   Id.

[133]   Tr. 260.

[134]   Tr. 454.  This list is somewhat different from that originally
claimed by Plaintiff at the time of her initial application.  Particularly, it
does not include hypertension or hypoglycemia, but does add fibromyalgia,
fluctuating vision, and arthritis.

[135]   Tr. 463, 464.

[136]   Tr. 464.

time, and could sit for twenty to thirty minutes at a time.[137]  She reported experiencing pain when bending, twisting, kneeling, walking up or down stairs, reaching for things, grasping and holding items.[138]  Additionally, opening jars and picking up coins off a table top were difficult for her, Plaintiff said.[139]  She testified that she was able to walk up to the second floor of her home (without stopping to rest) two to three times a week, to straighten up her house, to cook a few times a week, to grocery shop with her husband, to groom herself, to button her own clothes most of the time, to attend church twice a month, to watch television, to read, to help her grandson with homework, to wash dishes, to sweep every now and then, and to make up her bed with her husband's assistance.[140]  Sometimes she found it necessary to use a cane in order to maintain balance when going out of the house.[141]

At Plaintiff's second hearing, on February 17, 2004, Plaintiff claimed the following severe impairments: fibromyalgia, degenerative disk disease of the lumbar spine, depression, and chronic obstructive pulmonary disease ("COPD").[142]  Plaintiff testified that

---

[137]    Tr. 468-70.

[138]    Tr. 470-71.

[139]    Tr. 472.

[140]    Tr. 472-76, 478, 480.

[141]    Tr. 462.

[142]    Tr. 498.  Plaintiff dropped fluctuating vision and arthritis from the list of impairments she identified at her first hearing and added COPD.

the pain medication and epidural injections did not relieve her pain
at all and that her pain on an average day registered at an eight
on a ten-point scale.[143]  She also stated that her fingers sometimes
felt like they were on fire.[144]  Her description of her limitations
included the inability to stand for longer than five to ten
minutes.[145]  She said that she continued to use a cane to assist with
walking.[146]  Plaintiff stated that she could cook while sitting on
a stool two to three times a week and that she did not perform any
other household chores.[147]

### 4.  Expert Testimony

Two medical experts and one vocational expert testified at
Plaintiff's second hearing.  The first medical expert to testify,
George Weilepp, M.D., ("Dr. Weilepp"), focused on Plaintiff's
physical impairments.[148]  Based on his review of the medical
evidence, Dr. Weilepp testified that Plaintiff suffered from three
impairments:  osteoarthritis, disk disease, and very mild COPD.[149]

---

[143]   Tr. 517, 520.

[144]   Tr. 521.

[145]   Tr. 519.

[146]   Tr. 518.

[147]   Tr. 517-18.

[148]   See Tr. 532-52.

[149]   Tr. 533-34.  Dr. Weilepp discussed the diagnosis of fibromyalgia in
equivocal terms and did not list it as one of Plaintiff's severe impairments.
See Tr. 533 (discussing the RFC assessment by the rheumatologist based on "three
clinical visits without injections for what has been described as fibromyalgia").

Dr. Weilepp considered whether Plaintiff's symptoms met any listing in 20 C.F.R. Pt. 404, Subpt. P, App. 1 (the "Listings").[150]  He found that Plaintiff's impairments did not equal the listing requirements, particularly Listing 1.04, disorders of the spine, because he found "non-defined neurological sequela, no atrophy, actually no range of motion."[151]     According to Dr. Weilepp, Plaintiff possibly was limited to less-than-sedentary exertion for about a month after surgery.[152]

When asked about Plaintiff's physical capability, Dr. Weilepp opined that Plaintiff was capable of sitting without restriction for up to six hours in an eight-hour workday, standing for up to six hours in an eight-hour workday, carrying ten pounds frequently and twenty pounds occasionally,[153]   Other restrictions include no working at heights, no working on ladders, no frequent kneeling, no frequent crawling, no frequent squatting, and no frequent working overhead.[154]  The medical expert explicitly disagreed with the RFC assessment completed by Dr. Pocurull due to the absence of supporting objective records to substantiate the degree of

---

[150]    Tr. 534.

[151]    Id.

[152]    Tr. 534-35.

[153]    Tr. 499, 535.

[154]    Tr. 499, 535.

limitation recorded.[155]

Nancy Tarrand, M.D., ("Dr. Tarrand") was next to testify.[156] She stated that Plaintiff met the "A" criteria of Listing 12.04, affective disorders, but not the "B" criteria.[157]   Based on Plaintiff's depression, Dr. Tarrand analyzed Plaintiff's ability to work and opined that she had:  1) a very good ability to understand, remember, and carry out simple job instructions; 2) a good ability to follow work rules, to use judgment, to function independently, to understand, remember, and carry out detailed job instructions, to maintain personal appearance, to behave in an emotionally stable manner, to relate predictably in social situations, and to demonstrate reliability; and 3) a fair ability to relate to coworkers, to deal with the public, to cooperate with supervisors, to deal with work pressures, to maintain attention and concentration, to understand, remember, and carry out complex job instructions.[158]

The court then turned to Byron Pettingill ("Mr. Pettingill") as the vocational expert for the classification of Plaintiff's past relevant work.[159]   Mr. Pettingill classified psychiatric technician,

---

[155]   Tr. 538-39.

[156]   Tr. 552-61.

[157]   Tr. 499, 553.

[158]   Tr. 554-55.  Dr. Tarrand defined very good as more than satisfactory, good as satisfactory, and fair as neither excellent nor poor.  Tr. 554.

[159]   See Tr. 563-70.

23

corrections officer, security guard, and delivery driver as semiskilled occupations performed at a medium exertion level.[160] The vocational expert found no transferable skills.[161] Referring to the medical experts' testimony without restating the physical and psychological limitations they identified, the ALJ asked Mr. Pettingill if jobs existed that Plaintiff could perform at the light unskilled level.[162] Mr. Pettingill answered in the affirmative and provided the following examples: routing clerk, clerical checker, and office helper.[163] He opined that no jobs existed that could be performed by Plaintiff if she were as restricted in her abilities as indicated in Dr. Pocurull's RFC assessment.[164] Plaintiff's attorney asked the vocational expert no questions.[165]

## II. Standard of Review and Applicable Law

The court's review of a final decision by the Commissioner to deny disability benefits is limited to two issues: 1) whether substantial record evidence supports the decision; and 2) whether proper legal standards were used to evaluate the evidence. <u>Waters v. Barnhart</u>, 276 F.3d 716, 718 (5th Cir. 2002); <u>Brown v. Apfel</u>, 192

---

[160]   Tr. 565-66, 567.  Mr. Pettingill actually said that the security guard position was light to medium in exertion.  Tr. 566.

[161]   Tr. 567.

[162]   <u>Id.</u>

[163]   <u>Id.</u>

[164]   Tr. 569.

[165]   <u>See</u> Tr. 570.

24

F.3d 492, 496 (5th Cir. 1999).

The widely accepted definition of "substantial evidence" is "something more than a scintilla but less than a preponderance." Carey v. Apfel, 230 F.3d 131, 135 (5th Cir. 2000); see also Brown, 192 F.3d at 496. In applying this standard, the court is to review the entire record, but the court may not reweigh the evidence, decide the issues de novo, or substitute the court's judgment for the Commissioner's judgment. Brown, 192 F.3d at 496. The Commissioner is given the responsibility of deciding any conflicts in the evidence. Id. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405 (g). Only if no credible evidentiary choices of medical findings exist to support the Commissioner's decision should the court overturn it. Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988). In other words, the court is to defer to the decision of the Commissioner as much as is possible without making its review meaningless. Brown, 192 F.3d at 496.

The legal standard for determining disability under the Act is whether the claimant is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). To determine whether a claimant is capable of performing any "substantial gainful activity," the regulations provide that disability claims should be evaluated according to the

25

following sequential five-step process:

> (1) a claimant who is working, engaging in a substantial gainful activity, will not be found to be disabled no matter what the medical findings are; (2) a claimant will not be found to be disabled unless he has a "severe impairment;" (3) a claimant whose impairment meets or is equivalent to an impairment listed in [the Listings] will be considered disabled without the need to consider vocational factors; (4) a claimant who is capable of performing work that he has done in the past must be found "not disabled;" and (5) if the claimant is unable to perform his previous work as a result of his impairment, then factors such as his age, education, past work experience, and [RFC] must be considered to determine whether he can do other work.

Bowling v. Shalala, 36 F.3d 431, 435 (5th Cir. 1994)(paraphrasing 20 C.F.R. § 404.1520(a)(4).

To be entitled to benefits, a claimant bears the burden of proving she is disabled within the meaning of the Act. Wren v. Sullivan, 925 F.2d 123, 125 (5th Cir. 1991). By judicial practice, this translates into the claimant bearing the burden of proof on the first four of the above steps and the Commissioner bearing it on the fifth. Brown, 192 F.3d at 498. The analysis stops at any point in the five-step process upon a finding that the claimant is or is not disabled. Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994).

Pain can constitute a disabling impairment. See Cook v. Heckler, 750 F.2d 391, 395 (5th Cir. 1985). However, pain constitutes a disabling condition only when it is "constant, unremitting, and wholly unresponsive to therapeutic treatment." Selders v. Sullivan, 914 F.2d 614, 618-19 (5th Cir. 1990)(quoting Harrell v. Bowen, 862 F.2d 471, 480 (5th Cir. 1988)). The ALJ is

26

required to consider subjective evidence of pain along with other record evidence, but is ultimately responsible for making the determination of whether the pain is debilitating. <u>Wren</u>, 925 F.2d at 128. "While an ALJ must consider an applicant's subjective complaints of pain, he is permitted to examine objective medical evidence in testing the applicant's credibility. He may find, from the medical evidence, that an applicant's complaints of pain are not to be credited or are exaggerated." <u>Johnson v. Heckler</u>, 767 F.2d 180, 182 (5th Cir. 1985).

### III.  Analysis

In this case, the ALJ found that Plaintiff had not engaged in substantial gainful activity since her alleged onset date and that Plaintiff did have impairments that were severe.[166]  The ALJ stated that the record indicated that Plaintiff was status-post lumbar laminectomy and that she had mild COPD, hypertension, osteoarthritis, and a depressive disorder, all of which he found to be severe.[167]  The ALJ found that Plaintiff's severe impairments did not meet or equal any of the Listings.[168]  Rather, he found:

> The claimant has the residual functional capacity to perform light work as identified by the [Commissioner] at 20 C.F.R. 404.1567(b),[169] with no frequent kneeling,

---

[166]     Tr. 15, 16.

[167]     Tr. 16, 25.

[168]     Tr. 16.

[169]     "Light work involves lifting no more than twenty pounds at a time with frequent lifting or carrying of objects weighing up to ten pounds. . . . [A] job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm

crawling or squatting; and avoidance of heights, ladders, and overhead activity. Furthermore, the claimant has a depressive syndrome characterized by anhedonia or pervasive loss of interest in almost all activities, appetite disturbance with change in weight, sleep disturbance, decreased energy, feelings of guilt or worthlessness, and difficulty concentrating or thinking. The claimant has a mild degree of limitation in restriction of activities of daily living and a moderate degree of limitation in difficulties in maintaining social functioning and in difficulties in maintaining concentration, persistence, or pace, with no episode of decompensation of extended duration. Moreover, the claimant has a fair ability to relate to coworkers, deal with the public, cooperate with supervisor(s), deal with work pressures, maintain attention and concentration, and understand, remember, and carry out complex job instructions. She has a good ability to follow work rules, use judgement, function independently, understand, remember, and carry out detailed but not complex job instructions, maintain personal appearance, behave in an emotionally stable manner, relate predictably in social situations, and demonstrate reliability. The claimant has a very good ability to understand, remember, and carry out simple job instructions.[170]

The ALJ found that the objective medical evidence of record did not support Plaintiff's subjective complaints.[171] "The undersigned finds that the claimant's subjective symptoms are of only a mild to moderate degree and tolerable for the level of work, [RFC] and work limitations as found herein; and the claimant's subjective complaints are found not credible."[172] Similarly, the ALJ discounted the opinion of Dr. Pocurull expressed in the fibromyalgia

---

or leg controls." 20 C.F.R. § 404.1567(b).

[170]   Tr. 25-26.

[171]   Tr. 21.

[172]   Id.

28

RFC assessment form, finding the conclusion that Plaintiff could perform work at less than a sedentary level of exertion to be unsupported by objective medical evidence of record.[173]   The ALJ contrasted Dr. Pocurull's opinions with those of the medical experts and the reviewing physicians.[174]

Although the ALJ found that Plaintiff was not able to perform her past relevant work, the ALJ found that jobs existed in the national economy that Plaintiff could perform despite her impairments.[175]  Thus, the ALJ concluded that Plaintiff had not been under a disability as defined by the Act at any time up through June 18, 2004, the date of the ALJ's decision.[176]

Plaintiff requests judicial review of the ALJ's decision to deny disability benefits.   Plaintiff contends that the ALJ's decision is not supported by substantial evidence and that the ALJ did not follow proper legal procedures.   Specifically, Plaintiff argues that the ALJ erred in failing to consider evidence favorable to Plaintiff and erred in omitting consideration of Plaintiff's swollen fingers and reduced manipulative ability in his hypothetical question, which rendered the vocational expert's response incomplete and inaccurate.   Defendant argues that the ALJ's decision is

---

[173]   Tr. 24.

[174]   Id.

[175]   Tr. 23, 26.

[176]   Tr. 23, 26.

factually and legally correct.

### 1. Substantial Evidence

Plaintiff's chief complaint is that the ALJ ignored portions of the medical record that evidenced Plaintiff's "ongoing post-surgical vertebrogenic problems" and "demonstrable inflammatory orthopedic process," which supported her allegations of disability.[177]   Relying on <u>Sims v. Apfel</u>, 530 U.S. 103 (2000),[178] Plaintiff argues that the ALJ failed to mention 2003 medical records that indicate Plaintiff continued to experience paravertebral muscle spasms with severe pain radiating down her leg, pain with straight leg raising at zero degrees, and swollen interphalangeal joints. In response, Defendant argues that Plaintiff's pain was alleviated by the use of medication and, therefore, was not disabling. Defendant also notes that the treatment records relied on by Plaintiff reflect that Plaintiff experienced a decrease in pain after administration of medication.

Unfortunately for Plaintiff, the issue is not how much evidence supports a finding of disability, but, rather, whether substantial evidence supports the ALJ's finding that Plaintiff was not disabled.   <u>See</u> <u>Brown</u>, 192 F.3d at 496.   Substantial evidence is

---

[177]    Plaintiff's Motion for Summary Judgment, Docket Entry No. 14, p. 5.

[178]    The Court stated, in the context of deciding whether exhaustion was required to preserve judicial review of any issue: "Social Security proceedings are inquisitorial rather than adversarial.   It is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits." <u>Sims</u>, 530 U.S. at 110-11.

more than a scintilla, but less than a preponderance.  <u>Carey</u>, 230 F.3d at 135.  That means that, even if a majority of evidence supports a finding of disability, the court is required to affirm the ALJ's decision if it locates even a small amount of record evidence to justify his conclusion.  <u>See</u> <u>Brown</u>, 192 F.3d at 496 (directing the court to hold the ALJ's finding to be conclusive if supported by substantial evidence, even if the evidence preponderates against the decision).  Furthermore, a failure to mention every notation in the medical record does not equate with a failure to consider the evidence.  As the Seventh Circuit pointed out, the ALJ is not required "to evaluate in writing every piece of testimony and evidence submitted."  <u>Zalewski v. Heckler</u>, 760 F.2d 160, 166 (7th Cir. 1985).

As is abundantly evident from the lengthy factual history included in this Memorandum, the court has reviewed the entire record very closely.  Plaintiff points only to three medical notations that arguably support a finding of disability amid five years' worth of treatment records.  Without a doubt, the medical record includes some evidence that Plaintiff suffered from paravertebral muscle spasms and frequent pain, that Plaintiff sometimes experienced pain with straight leg raising, and that her hands on occasion were swollen.  Despite evidence of this sort, the court finds more than a scintilla of evidence to support the ALJ's conclusion that Plaintiff was not disabled.

Shortly after her surgery in September 1999, two treating physicians shared the view that Plaintiff's back problems did not prevent her from working.   Dr. Megahed rejected Plaintiff's assertion that she would not be able to return to work by explaining that the medical findings did not support that conclusion.[179]   In February 2000, Dr. Shukla offered to set appropriate work restrictions that would allow her to tolerate work as a psychiatric technician again.[180]

Dr. Megahed noted improvement post-surgery in October and November 1999.[181] Plaintiff had a back examination in June 2000 that was normal except for slight tenderness[182] and reported only occasional lower back pain in July 2000.[183] In September 2000, she was ambulating independently with a limp.[184]   A month later, she demonstrated full motor strength in her upper and lower extremities, no evidence of muscular atrophy, although she continued to ambulate with a slight limp.[185] In December 2000, Plaintiff exhibited minimal difficulties walking on her heels and toes and had equal and

---

[179]    Tr. 164.

[180]    Tr. 158.

[181]    Tr. 163, 164.

[182]    Tr. 143.

[183]    Tr. 141.

[184]    Tr. 133.

[185]    Tr. 104.

symmetric deep tendon reflexes at the knees.[186]

A few months later, a sensory examination was intact to pinprick, temperature, light touch, and vibration joint position was intact.[187]  Plaintiff's gait was steady and finger-to-nose and heel-to-shin tests were normal.[188]  In May 2001, Plaintiff again showed full motor strength throughout, full sensory perception, a steady gait, and normal coordination.[189]  An examination in July 2001 revealed no localized sensory loss, muscle weakness, or atrophy, even though Plaintiff walked with a slight limp.[190]  Dr. Pocurull noticed improvement in Plaintiff in November 2001, when he reported that Plaintiff experienced no tingling or numbness, walked with a normal gait, and experienced no pain on straight leg raising.[191]

The record reveals no doctor visits for back pain from late 2001 until February 2003, when she experienced no pain on straight leg raising.[192]  In September 2003, Plaintiff began a series of visits to area emergency rooms for treatment of her back pain.  On each of the four occasions, the treating providers apparently administered pain medication to alleviate Plaintiff's immediate

---

[186]   Tr. 122.

[187]   Tr. 110.

[188]   Tr. 110-11.

[189]   Tr. 106.

[190]   Tr. 255.

[191]   Tr. 296.

[192]   Tr. 393.

symptoms and discharged her with prescriptions for pain medication and/or muscle relaxants.[193]  Other than one visit to Fort Bend Family Health Center in October 2003,[194] Plaintiff apparently did not schedule regular medical treatment with any treating physician after late 2001.

Although Plaintiff's back pain has been long-lasting in duration, it has responded to certain medications and treatment. Contrary to her hearing testimony that pain medications and epidural injections provided no relief at all, Plaintiff often reported to her physicians and to the Social Security Administration that some of the medications provided a degree of at least temporary relief.[195] Anti-inflammatory injections and caudal epidural steroid injections proved very helpful, according to Plaintiff's own reports.[196] Plaintiff also managed to find some pain relief by applying heat to the affected area and lying down with a pillow between her legs.[197] Examinations in December 2000, November 2001, February 2003, and December 2003 produced negative results on straight leg raising tests.[198]

---

[193]   See Tr. 396-402, 408-16, 417-25, 426-28.

[194]   See Tr. 404-07.

[195]   See Tr. 57, 99-102, 129, 401, 404, 465.

[196]   See Tr. 129, 100-102.

[197]   Tr. 57, 468-69.

[198]   Tr. 122, 296, 393, 421.

The swelling in Plaintiff's extremities was alleviated on at least one occasion by a change in medication.[199]  Many progress notes reflect that Plaintiff was experiencing no pain or swelling in her hands.[200]   Additionally, the record includes long gaps between Plaintiff's complaints of swelling in her hands.

Other than Dr. Pocurull's opinion in the fibromyalgia RFC assessment[201] and Plaintiff's testimony at the first hearing, nothing in the record supports limiting Plaintiff's work to a less-than-light exertional level.  In July 2001, Plaintiff reported that she was able to walk for less than twenty minutes at a time and to sit for twenty minutes and, in November 2002, she testified that she was able to stand for ten to fifteen minutes at a time, to walk for five minutes at a time, to sit for twenty to thirty minutes at a time, and to walk up one flight of stairs without stopping.[202]   Such limitations are not inconsistent with light work.  Moreover, despite her pain and other symptoms, Plaintiff maintained an ability to cook, to perform some household chores, to grocery shop, to attend

---

[199]    See Tr. 189.

[200]    See Tr. 113, 122, 255, 263, 421.

[201]    Dr. Pocurull's assessment is of questionable weight.  Dr. Weilepp, the medical expert at Plaintiff's second hearing explicitly rejected Dr. Pocurull's RFC opinion because it lacked supporting objective medical evidence. Tr. 538-39.   Furthermore, Dr. Pocurull's fibromyalgia RFC assessment was completed in October 2001, subsequent to a prior examination that rendered somewhat negative results.  See Tr. 297, 310-15.  It is impossible to determine whether the improvements noted by Dr. Pocurull at the time of the November examination would have changed his assessment of Plaintiff's physical abilities. See Tr. 296.

[202]    Tr. 253, 469-70, 472-73.

35

church, to read, to watch television, to help her grandson with homework, to wash dishes, to bathe, to brush her teeth, to fix her hair, to shave, to select appropriate clothing, to dress herself, to cook (a little at a time), to pay bills, to visit, to go out to eat, and to shop/make change without the assistance of another person.[203]  The physician who examined Plaintiff in July 2001 noted that she was able to button her clothes and sign her name.[204]

All of this evidence adds up to more than a scintilla demonstrating that Plaintiff's back pain was not constant, unremitting, and wholly unresponsive to treatment.  Furthermore, it is sufficient evidence of Plaintiff's ability, despite occasional swelling in her hands and back pain, to complete multiple activities of daily living such that this court must affirm the ALJ's conclusion that Plaintiff was able to perform work tasks at a light exertional level with restrictions.

**2.  Proper Legal Procedures**

Plaintiff's second argument is that the ALJ's RFC was deficient in that he disregarded Plaintiff's interphalangeal swelling and associated manipulative limitations.  As a result of the incorrect RFC, Plaintiff continues, the ALJ offered an incomplete hypothetical question to the vocational expert and, accordingly, erred in relying on the vocational expert's response.

---

[203]     Tr. 59-60, 253, 260, 472, 474-76, 478.

[204]     Tr. 256.

Defendant responds that, based on Plaintiff's daily activities on record, the ALJ's RFC properly reflected Plaintiff's remaining ability to do sustained work activities.

The ALJ may properly rely on the testimony of a vocational expert in determining restrictions on capability to work if the hypothetical question presented to the vocational expert incorporates reasonably all disabilities recognized by the ALJ, and the claimant is afforded the opportunity to correct deficiencies in the ALJ's question.  Boyd v. Apfel, 239 F.3d 698, 706-07 (5th Cir. 2001); Bowling, 36 F.3d at 436.  The hypothetical question must take "into account all the restrictions reasonably warranted by the evidence." Domingue v. Barnhart, 388 F.3d 462, 463 (5th Cir. 2004), cert. denied, ___ U.S. ___, 125 S.Ct 1667 (2005).  If the hypothetical question meets the above criteria, then the ALJ may justifiably rely on the vocational expert's testimony in deciding job availability for a person with the plaintiff's limitations. Masterson v. Barnhart, 309 F.3d 267, 273-74 (5th Cir. 2002).

Under the proper legal standard, then, this court must determine at the onset whether the ALJ's hypothetical "incorporate[d] reasonably all disabilities of the claimant recognized by the ALJ" Bowling, 36 F.3d at 436; see also Boyd, 239 F.3d at 706-07.  At the administrative hearing, the ALJ posed three hypothetical questions to the vocational expert.  The first included the all of the physical limitations suggested by the first medical

expert.[205] The second added the mental limitations recognized by the second medical expert.[206] The third was based entirely on the fibromyalgia assessment completed by Dr. Pocurull.[207] The vocational expert testified that the hypothetical individual in the first two questions would be able to perform jobs at the light, unskilled level, but the hypothetical individual in the third question would not be able to perform any competitive work.[208] For the reasons stated above regarding substantial evidence, the court finds that the second hypothetical sufficiently reflected Plaintiff's impairments to the extent the ALJ reasonably found them supported by the record.

The court also must inquire whether the claimant or her representative had an opportunity at the hearing to "correct deficiencies" in the hypothetical questions by "mentioning or suggesting to the vocational expert any purported defects . . . (including additional disabilities not recognized by the ALJ's findings and disabilities recognized but omitted from the question)." Bowling, 36 F.3d at 436; see also Boyd, 239 F.3d at 707. At the hearing, Plaintiff's counsel was given the opportunity to present alternative hypothetical questions to the vocational

---

[205]    Tr. 567.

[206]    Id.

[207]    Tr. 568-69.

[208]    Tr. 567, 569.

expert, but declined.[209]

The court finds that the ALJ's second hypothetical question included all of Plaintiff's disabilities reasonably recognized by the ALJ and that the Plaintiff's representative did not avail himself of the opportunity to correct the ALJ's question to include manipulative limitations. Accordingly, the ALJ was legally correct in relying on the vocational expert's response to that question as substantial evidence in support of the denial of benefits.

The ALJ's decision is supported by substantial evidence and is founded in sound legal standards.

### IV.  Conclusion

Based on the foregoing, the court **DENIES** Plaintiff's Motion for Summary Judgment and **GRANTS** Defendant's Motion for Summary Judgment.

**SIGNED** in Houston, Texas, this 4th day of November, 2005.

_____
Nancy K. Johnson
United States Magistrate Judge

---

[209]    Tr. 570.